# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

RUBY N.,[1]

                  Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,

                Defendant.      Case No. 3:20-CV-00037-TMB

## DECISION AND ORDER

On or about March 31, 2016, Ruby N. ("Plaintiff") protectively filed an application

for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2]

alleging disability beginning January 4, 2011.[3]  Plaintiff has exhausted her administrative

remedies and filed a Complaint seeking relief from this Court.[4]  Plaintiff's opening brief

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims under Title II and Title XVI.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 15.  The application lists May 12, 2016.  A.R. 275.  Additionally, the SSA's initial decision lists a protective filing date of June 20, 2012, which was the date Plaintiff's previous application was closed.  A.R. 78.

[4] Docket 1 (Plaintiff's Compl.).

asks the Court to reverse and remand the agency's decision for the immediate payment of benefits.[5] The Commissioner filed an Answer and a brief in opposition to Plaintiff's opening brief.[6] Plaintiff filed a reply brief on August 8, 2020.[7] Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8] For the reasons set forth below, Plaintiff's request for relief will be granted.

## I. STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11] In reviewing the agency's determination, the Court considers the

---

[5] Docket 12 (Plaintiff's Br.).

[6] Docket 10 (Answer); Docket 13 (Defendant's Br.).

[7] Docket 14 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 2 of 42

evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which she did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16] In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[17]

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

Case 3:20-cv-00037-HRH   Document 15   Filed 10/19/20   Page 3 of 42

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[18]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[24] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[26] *The ALJ determined that Plaintiff had not engaged in substantial activity during the period from her alleged onset date of January 4, 2011 through her date last insured of December 31, 2013.*[27]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[27] A.R. 17.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 5 of 42

twelve-month duration requirement.[28]  *The ALJ determined that Plaintiff had the following severe impairments: embolic disease; a history of a cerebrovascular accident; renal disease; speech dysphasia secondary to hypertension; a cognitive disorder; and an anxiety disorder.[29]*

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.[30]  If not, the evaluation goes on to the fourth step.  *The ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[31]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[32]  *The ALJ determined that the Plaintiff had the residual functional capacity to perform light*

---

[28] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[29] A.R. 17.

[30] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[31] A.R. 17.

[32] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*work except the Plaintiff was limited to no exposure to unprotected heights and hazardous machinery; occupations that required only occasional verbal and telephone communication; and simple, routine, and repetitive tasks.[33]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[34] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that the Plaintiff would be unable to perform any past relevant work.[35]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[36] *The ALJ determined that, through the date last insured, there were jobs that existed in significant numbers that Plaintiff could have performed, including parking lot attendant; office helper; and storage rental clerk.[37]*

---

[33] A.R. 20.

[34] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[35] A.R. 25.

[36] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[37] A.R. 26–27.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 7 of 42

The ALJ concluded that Plaintiff was not disabled at any time from January 4, 2011, the alleged onset date, through December 31, 2013, the date last insured.[38]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1962.[39]  Plaintiff reported no earnings after 2008.  Previously, she reported working in military accounting and as administrative assistant.[40]  On or about November 23, 2016, the Social Security Administration ("SSA") determined that Plaintiff was not disabled under the applicable rules.[41]  Plaintiff appeared and testified with representation at a hearing held on December 17, 2018 before ALJ Cecelia LaCara.[42] On January 23, 2019, the ALJ issued an unfavorable ruling.[43]  On January 4, 2020, the Appeals Council denied Plaintiff's request for review.[44]  On February 18, 2020, Plaintiff appealed the Commissioner's final decision to this Court; she is represented by counsel in this appeal.[45]

---

[38] A.R. 27.

[39] A.R. 275.

[40] A.R. 283, 297, 306.

[41] A.R. 96.

[42] A.R. 54–67.

[43] A.R. 12–27.

[44] A.R. 1–5.

[45] Docket 1.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 8 of 42

*Medical Records and Medical Opinion Evidence*

The medical evidence spans from 2011 through 2018. However, the relevant time period for this litigation is limited to the alleged onset date of January 4, 2011 through the date last insured of December 31, 2013.[46] The following are the relevant medical records[47] during the relevant time period:

On January 4, 2011, Plaintiff presented to the emergency department of Providence Alaska Medical Center for chest discomfort and left antecubital pain. She reported recent cocaine abuse and her initial urine screen was positive for cocaine and THC. She was admitted for control of blood pressure and a possible coronary angiography. On physical examination, the attending physician, Alan Skolnick, M.D., observed that Plaintiff had blood pressure of 248/176 and a heart rate of 90. Dr. Skolnick assessed Plaintiff with a hypertensive emergency; chest pain concerning for angina; abnormal electrocardiogram that could not exclude acute anteroseptal myocardial infarction; cocaine abuse; and dysfunctional uterine bleeding. On January 5, 2011, while at Providence hospital, Plaintiff saw Steven Tucker, M.D., for a consulting evaluation of azotemia and hypertension. He assessed Plaintiff with stage "IV-suspected-likely"

_____

[46] A.R. 15. Because Plaintiff was only insured for disability benefits through December 31, 2013, she must establish a disability on or prior to that date. *See* 42 U.S.C. § 423(d)(1)(A).

[47] There are multiple duplicate treatment notes in the Court's record. To the extent possible, the Court cites the first treatment note to appear in the medical record.

secondary to hypertensive nephrosclerosis; hypertension; and substance abuse. Plaintiff was discharged on January 8, 2011.[48]

On January 11, 2011, Plaintiff went to the emergency department at Providence hospital for an acute decrease in vision. The attending physician, Thomas Leigh, M.D., observed a normal mental status; normal gait; normal strength, sensation, and deep tendon reflexes; a visual acuity of 2100 in the left and right eyes and 20/50 in both eyes without glasses. Dr. Leigh noted that an MRI of the brain "showed multiple infarcts reportedly suggestive of embolic disease or perhaps vasospasm." Her urine screen was negative for cocaine and TCH and positive for benzodiazepines. Dr. Leigh recommended immediate follow up with a retinal specialist.[49] The MRI of Plaintiff's brain showed multiple small acute infarcts scattered throughout both cerebral hemispheres.[50]

On January 25, 2011, Plaintiff saw Paul Steer, M.D., to re-establish primary care. Dr. Steer noted that Plaintiff had not had a primary care doctor since 1999 and she was unclear what her blood pressure status was. Plaintiff reported "some blurring of vision, fogginess of vision primarily in the right eye." Dr. Steer observed that "after careful questioning between her and her significant other, it is obvious that she is having a mild expressive aphasia." Dr. Steer assessed Plaintiff with chronic hypertensive nephropathy,

---

[48] A.R. 411–20.

[49] A.R. 424–33.

[50] A.R. 540.

probably stage III to IV; major retinopathy; multiple transient ischemic attacks; residual mild expressive aphasia; and a right visual field defect.[51]

On February 7, 2011, Plaintiff saw Alan Skolnick, M.D., at Alaska Heart Institute, for malignant hypertension. She reported decreased vision in her right eye; headaches; shortness of breath with moderate activity; and intermittent chest discomfort, but not necessarily with physical activity. On physical examination, Dr. Skolnick observed an appropriate mood, memory, judgment, and affect. He observed that Plaintiff was cooperative, alert and oriented, and had a normal gait and balance, no ataxia, and no gross motor or sensory deficits were noted.[52]

On March 16, 2011, Plaintiff saw Dr. Skolnick. She reported recommencing smoking with increased wheezing and coughing. She reported fatigue and shortness of breath walking short distances and at rest on occasion. She reported a decrease in her retinal hemorrhages. On physical examination, Dr. Skolnick observed an appropriate mood, memory, judgment, and affect. He observed that Plaintiff was cooperative; alert and oriented; and had a symmetrical face, normal fluency of speech, no gross motor deficits, no edema, and no gross sensory deficits.[53]

On May 4, 2011, Plaintiff followed up with Dr. Skolnick. She reported improved vision, a rash, and that she could walk 6 blocks and back without stopping. She also

---

[51] A.R. 836–37.

[52] A.R. 529–31.

[53] A.R. 532–33.

reported feeling stressed by caring for her grandchildren and that she had started smoking again. On physical examination, Dr. Skolnick observed an appropriate mood, memory, judgment, and affect. He observed that Plaintiff was cooperative; alert and oriented; and had a symmetrical face, normal fluency of speech, no gross motor deficits, and no gross sensory deficits.[54]

On July 19, 2011, Plaintiff saw ANP Honas. She reported dyspnea on exertion; becoming lethargic and having trouble forming words when her blood pressures were low; and not being able to walk long distances without "becoming winded." On physical examination, ANP Honas observed that Plaintiff's blood pressures were "fairly labile" and Plaintiff became symptomatic with low pressures.[55]

On November 7, 2011, Plaintiff saw Chadwick Barnes, M.D., at the Kidney and Hypertension Clinic of Alaska. Dr. Barnes noted that Plaintiff's renal function had improved and the "risk of progressing to end-stage kidney disease over [her] lifetime [was] moderate low to moderate." Dr. Barnes also noted that Plaintiff continued to have residual speech and cognitive defects. On physical examination, he observed that Plaintiff's speech was "disordered" and that she spoke "with effort."[56]

On November 30, 2011, Plaintiff saw ANP Honas at Alaska Heart Institute. Plaintiff reported that her vision had "vastly improved" and she was "able to drive herself around."

---

[54] A.R. 524–28.

[55] A.R. 516–19.

[56] A.R. 511–14.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 12 of 42

She also reported that she had been "unable to find work due to the stress that causes her blood pressure to elevate and her studdering from the stroke." Plaintiff reported a studder and problems with speech during job interviews. She reported depression, but she denied referrals for SSRI and counseling. ANP Honas observed that Plaintiff was alert and oriented and tearful. She noted that Plaintiff's blood pressures were still not under control and that Plaintiff was "still having neurological deficits in speech and function," but that Plaintiff had not formally seen a neurologist.[57] On the same date, ANP Honas wrote a letter on Plaintiff's behalf. In it, ANP Honas stated, "Any high stress situation increases [Plaintiff's blood] pressure and thus puts her at risk for recurrent stroke. She has tried to find work but due to the high blood pressure and residual deficits from her stroke she [is] unable to maintain employment."[58]

On December 8, 2011, Plaintiff saw Dr. Steer. On physical examination, Dr. Steer noted that Plaintiff experienced "significant expressive aphasia — can't get kew (sic.) word of sentence out ½ time." He noted "CVA (cerebrovascular accident) when very hypertensive with residual expressive aphasia." Dr. Steer referred Plaintiff to speech therapy.[59]

On December 15, 2011, Plaintiff saw Dr. Skolnick for follow up for hypercholesterolemia; diastolic heart failure; hypertension; chronic kidney disease; and

---

[57] A.R. 506–10.

[58] A.R. 930.

[59] A.R. 833.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 13 of 42

cerebral atherosclerosis with stroke. She reported trouble sleeping; palpitations; and a studder. Dr. Skolnick noted that Plaintiff's blood pressure was "still out of control."[60]

On December 20, 2011, Plaintiff saw Karyn Joseph, MA, a speech therapist at Providence Alaska Medical Center, for a speech evaluation and treatment. MA Joseph observed deficits with abstract naming, information sequencing, and short-term memory and recent memory skills. She observed dysarthric speech and specific problems with prosody and rate. MA Joseph recommended skilled speech therapy to address Plaintiff's speech-language impairments.[61]

On December 22, 2011, Plaintiff saw MA Joseph. Plaintiff reported dizziness and feeling light-headed during breathing exercises. MA Joseph reported working on overall speech intelligibility and short-term memory. She observed that Plaintiff was "pleasant and cooperative with treatment tasks."[62]

On September 27, 2012, Plaintiff saw Michael Rose, Ph.D., for a diagnostic evaluation "to assess her suspected difficulties associated with 'expressive dysarthria, cognitive deficits, language disorder, stroke, speech and hearing, vision difficulties, chronic kidney disease, and hypertension.'" Plaintiff reported that she usually arose around 6:30am, took her blood pressure medication, ate, made beds, did laundry, checked email, and did household chores. She indicated that she could do the dishes,

---

[60] A.R. 492–95.

[61] A.R. 915–18.

[62] A.R. 450–52. Plaintiff participated in speech therapy sessions with MA Joseph on January 6, 2012 and January 10, 2012. A.R. 453–58.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 14 of 42

take out the trash, vacuum or sweep the floor, do laundry, prepare and cook meals, and go shopping.  She also reported spending time with her grandchildren and going to bed around 10:00pm.  She reported having a driver's license and that she was able to drive. Plaintiff reported sleeping difficulties and panic attacks.  She reported smoking for 25 years, drinking alcohol once a week, and using marijuana "in her younger years."  Dr. Rose noted "no reported use of cocaine, methamphetamine, or any other illicit substance, including inhalants."  Plaintiff also reported, "I have always been involved in credit and collections and working as a customer service representative since I was 16 years old until 2008.  Then, I turned my boss in for embezzling, and I got fired."  She reported subsequent health problems and a cerebral vascular accident.  She indicated she would like to "change fields, but I don't have an education."  Dr. Rose observed that Plaintiff's fine motor movements were "delayed and slow."  He observed that Plaintiff was courteous and cooperative in completing all assessment tasks, but also appeared to be "highly anxious, tense, and easily stressed, frequently and rapidly breathing in and out as she completed various test items."  Dr. Rose noted that Plaintiff's speech was understandable, but she "had some word-finding difficulties as well as dysfluencies."  Dr. Rose observed that Plaintiff's short-term memory was deficient; long-term memory was extremely deficient; her visual-motor skills were low average; calculations and similarities were deficient; her insight was limited and judgment was fair.  Based on the diagnostic test, Dr. Rose concluded that Plaintiff met the criteria for cognitive disorder, not otherwise specified; borderline intellectual functioning; and anxiety disorder, not otherwise specified. He opined that Plaintiff's ability to understand, retain and follow instructions and sustain

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 15 of 42

attention to perform simple repetitive tasks was limited but not precluded; concentration, persistence and pace were below average; she had no restrictions on daily activities; and no apparent difficulties in her ability to maintain appropriate social functioning. Dr. Rose also noted that there were no indications that Plaintiff presented a risk to "emotionally deteriorate or psychologically decompensate in work-like situations; however, she [was] highly anxious and easily stressed, and this may interfere with her work performance." He opined that Plaintiff could "probably meet usual work demands with respect to attendance, safety, and following procedures and policies as long as she is working in a fairly menial position." He noted that Plaintiff would "probably accept supervision that is concrete and well-explained." He recommended cognitive therapy.[63]

On November 16, 2012, Plaintiff saw Susan Klimow, M.D., for a consultative examination. She reported that stroke resulted in loss of central vision, but her vision had stabilized with glasses and she was able to drive. She also reported right-sided hearing loss. Dr. Klimow noted that "stress situations increase [Plaintiff's] blood pressure, and put her at risk for recurrent stroke." Plaintiff reported that it was "very frustrating not to be able to communicate on the level she did previously." Dr. Klimow observed that Plaintiff's speech was slow and deliberate; she had dysarthria and signs of oral apraxia; and she understood normal speech levels. Dr. Klimow opined that Plaintiff had "no deficits in her ability to sit, stand, move about, lift, carry, handle objects, or see (she wears glasses and can drive)". Dr. Klimow also opined that Plaintiff would have difficulty

---

[63] A.R. 849–58.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 16 of 42

communicating/processing quickly in a work environment due to "expressive aphasia, dysarthria, and cognitive deficits (per speech therapy notes)."[64]

On December 13, 2012, Plaintiff saw Dr. Steer. She reported that she had not abused cocaine for more than 18 months. Plaintiff reported fatigue. Dr. Steer observed no edema. Dr. Steer assessed Plaintiff with high blood pressure, not controlled; residual expressive aphasia; chronic renal disease; and high lipids.[65]

On February 12, 2013, Plaintiff followed up with Dr. Skolnick. She reported that her blood pressure had recently come under "much better control." She reported improved vision and that she had been meticulous about her diet and watching her sodium intake. Plaintiff denied lower extremity edema or intermittent claudication. Dr. Skolnick assessed Plaintiff with malignant hypertensive heart disease causing nephropathy, retinopathy, cardiomyopathy, and cerebrovascular disease.[66]

The following are the relevant records after December 31, 2013:

On July 16, 2014, Plaintiff followed up for her annual exam with Dr. Skolnick. She reported being "stressed a lot," having panic attacks, experiencing hot flashes, continuing to smoke cigarettes, feeling fatigued and being sleep deprived, and having some chronic back pain. She reported an improvement in her vision problems and denied chest discomfort, shortness of breath, palpitations, lower extremity edema or claudication, and

---

[64] A.R. 860–61.

[65] A.R. 484.

[66] A.R. 476–80.

orthopnea. She reported having Stage II chronic kidney disease. On physical examination, Dr. Skolnick observed that Plaintiff was cooperative; alert and oriented; and had a symmetrical face, normal fluency of speech, and no gross motor deficits. He observed an appropriate mood and judgment, normal affect, and normal memory.[67]

On January 4, 2016, Plaintiff presented to the emergency department at Providence hospital with confusion and a blood pressure in the 250/160 range. She was admitted to the ICU. While admitted, Plaintiff was assessed with hypertensive crisis with malignant hypertension and hypertensive encephalopathy; severe labile hypertension; acute kidney injury; anxiety disorder with significant psychosocial stress at home; thrombotic microangiopathy; history of cerebral vascular accident; hyperphosphatemia/secondary hyperparathyroidism; and was positive for cocaine. Plaintiff was discharged on January 9, 2016.[68]

On January 11, 2016, Plaintiff initiated outpatient dialysis with Dr. Gitomer. He noted that Plaintiff's hypertension was "[b]etter controlled at this time." Dr. Gitomer observed no edema. He diagnosed Plaintiff with "[a]cute kidney injury with no evidence of renal recovery as of yet."[69]

On February 8, 2016, Plaintiff followed up with Dr. Gitomer. She reported social stresses at home and abstinence from smoking for one month. On physical examination,

---

[67] A.R. 470–73.

[68] A.R. 545–620.

[69] A.R. 806–09.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 18 of 42

Dr. Gitomer observed that Plaintiff's blood pressure was 147/92; her lungs were clear; she had no edema; and she was alert and pleasant.[70]

On February 27, 2016, Plaintiff followed up with Dr. Gitomer. On physical examination, Dr. Gitomer observed that Plaintiff's blood pressure was 146/86; her lungs were clear; she had no edema; and she was alert and comfortable. He noted that Plaintiff was stable with an acute kidney injury and evidence of improving kidney function.[71]

On March 4, 2016, Plaintiff followed up with Dr. Gitomer. He noted that Plaintiff had "been declared end-stage renal disease." She reported that her anxiety was stable and was "surprised how good her blood pressures [were]." She reported abstaining from cigarette smoking for greater than 2 months. Dr. Gitomer referred Plaintiff for an arteriovenous fistula.[72]

On March 8, 2016, Plaintiff followed up with Dr. Skolnick. He noted that "recently due to family stress, the patient had basically stopped all her medications and was admitted to Providence Medical Center in January with a hypertensive emergency likely exacerbated by cocaine abuse." Plaintiff denied lower extremity edema. He noted that Plaintiff's renal function had worsened to the point of requiring dialysis, but that she was tolerating dialysis and taking her medications.[73]

---

[70] A.R. 697–700.

[71] A.R. 694–96.

[72] A.R. 795–99.

[73] A.R. 686–90.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 19 of 42

On April 18, 2016, Plaintiff followed up with Dr. Gitomer as part of her routine monthly dialysis care. She reported no issues with dialysis, no dizziness, no dialysis complications, no edema, but also reported continued smoking and stress due to family issues. She reported abstinence from cocaine abuse. Dr. Gitomer noted a "great mood" and "amazing blood pressures." He opined that Plaintiff was "coping with her level of anxiety well" and that she remained on klonopin.[74]

On May 19, 2016, Plaintiff had a preoperative physical for a right radiocephalic arteriovenous fistula with Peter Marbarger, M.D., at Alaska Regional Hospital. She reported being on dialysis since January 2016. Dr. Marbarger opined that Plaintiff's renal failure was due to malignant hypertensive heart disease causing nephropathy, retinopathy, cardiomyopathy, cerebrovascular disease, and possibly hemolytic uremic syndrome. He also opined that Plaintiff was a transplant candidate.[75]

On May 16, 2016, Plaintiff saw Dr. Gitomer. She reported that her clonazepam was working well and she denied anxiety issues. She reported continuing to smoke. Dr. Gitomer noted that Plaintiff's blood pressure was very well controlled and recommended continuing current treatment parameters. He noted that Plaintiff would have surgery to place an arteriovenous fistula.[76]

---

[74] A.R. 679–82.

[75] A.R. 671–72.

[76] A.R. 785–89.

On May 21, 2016, Plaintiff underwent surgery to place a right forearm arteriovenous fistula.[77]

On June 17, 2016, Plaintiff saw Dr. Gitomer. She reported that the right forearm arteriovenous fistula had failed and she was interested in peritoneal dialysis. She reported smoking 1 cigarette per day and that her anxiety was well controlled. Dr. Gitomer noted that Plaintiff's hypertension was the "best control of her at this time" and recommended continuing with the current treatment parameters.[78]

On September 6, 2016, Plaintiff underwent surgery to reposition and replace the catheter as it was nonfunctioning.[79]

On October 7, 2016, Plaintiff underwent laparoscopic peritoneal dialysis catheter manipulation and omentumectomy.[80]

On November 14, 2016, Plaintiff followed up with Dr. Gitomer. She reported that her catheter was no longer working. On exam, Dr. Gitomer observed no edema. Dr. Gitomer noted that Plaintiff's hypertension was controlled and Plaintiff was stable.[81]

On December 19, 2016, Plaintiff followed up with Dr. Gitomer. She reported that her anxiety was well controlled. Dr. Gitomer observed that Plaintiff's blood pressure was

---

[77] A.R. 667–68.

[78] Plaintiff followed up regularly with Dr. Gitomer from July 27, 2016 through October 24, 2016. Dr. Gitomer observed no edema. A.R. 760–63, 765–68, 770–83, 1062–67.

[79] A.R. 710–12.

[80] A.R. 716–17.

[81] A.R. 755–59.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 21 of 42

under control; her lungs were clear; she had no edema; and she was alert and watching television.[82]

On December 22, 2016, Plaintiff underwent laparoscopic peritoneal dialysis catheter exchange and lysis of adhesions.[83]

On January 13, 2017, Plaintiff followed up with Dr. Gitomer. She reported that her peritoneal dialysis catheter was working very well. She reported her insomnia was well controlled and her anxiety was "[b]etter on klonopin." Dr. Gitomer observed no edema and opined that Plaintiff's blood pressure was well controlled.[84]

On April 24, 2017, Plaintiff followed up with Dr. Gitomer. She reported doing well with peritoneal dialysis and required dialysis twice daily. Dr. Gitomer noted that Plaintiff's blood pressure was reasonably controlled. He noted that Plaintiff was seen at Swedish hospital for a kidney transplant and was put "on hold for 1 year due to positive [a] cocaine [test]."[85]

---

[82] A.R. 750–54.

[83] A.R. 722–23.

[84] A.R. 1056–58.

[85] A.R. 1046–49. From April 24, 2017 through October 19, 2018, Plaintiff regularly followed up with Dr. Gitomer and Sarah Bilak-Larson, ANP, at Liberty Dialysis. At most visits, Dr. Gitomer noted that Plaintiff's blood pressures were reasonably controlled, she had no edema and no dialysis issues, but she reported stress and psychosocial issues at home. Plaintiff regularly refilled her Klonopin prescription for anxiety. A.R. 977–1045.

On August 31, 2017, Woo Jin Chong, R.N., at Liberty Dialysis, wrote a letter on Plaintiff's behalf.  He stated that Plaintiff had been "diagnosed with end stage renal failure requiring daily peritoneal dialysis which is a life-sustaining treatment for patient."[86]

On March 22, 2018, Plaintiff followed up with Dr. Gitomer.  She reported having "a great time snowmachining."  Dr. Gitomer noted that Plaintiff's blood pressure was "much better controlled" and that she had "no dialysis issues."[87]

On June 15, 2018, Plaintiff saw Dr. Skolnick for an annual follow up examination. She reported that peritoneal dialysis was working well.  Dr. Skolnick noted that Plaintiff's echocardiogram was negative for ischemia and Plaintiff had normal left ventricular systolic function.  Dr. Skolnick observed that Plaintiff was cooperative; alert and oriented; her face was symmetrical; she had normal fluency of speech; no gross motor deficits; and no lower extremity edema or claudication.  He observed an appropriate mood; appropriate judgment; normal affect; and normal memory.  Dr. Skolnick noted that Plaintiff's hypertensive chronic kidney disease malignant with chronic kidney disease stage V or end stage renal disease was "under reasonable control"; her chronic diastolic heart failure was "well-controlled"; and her hyperlipidemia was "treated."[88]

---

[86] A.R. 738.

[87] A.R. 1004–06.

[88] A.R. 932–36.

On June 21, 2018, Plaintiff followed up with Dr. Gitomer. She reported skiing and swimming at a lake and that she was no longer considered to have heart failure. Dr. Gitomer noted that Plaintiff's blood pressure had improved, but it was not at goal.[89]

On November 13, 2018, Dr. Gitomer completed a physical residual functional capacity questionnaire prepared by Plaintiff's attorney. He diagnosed Plaintiff with end-stage renal disease; labile hypertension; and abdominal adhesions. Dr. Gitomer opined that Plaintiff's prognosis was poor. He opined that Plaintiff's depression and anxiety affected Plaintiff's physical condition. Dr. Gitomer also opined that Plaintiff was capable of a low stress job; that she could stand/walk a total of about 4 hours in a workday; needed 1-2 breaks of 15 minutes per day for dialysis; needed her legs to be elevated 20% of the day in an 8-hour workday; could frequently lift and carry up to 10 pounds; and was able to climb stairs frequently. He opined that Plaintiff would likely be absent four days per month for treatment.[90]

*Loren N.'s Written Statement*

On or about December 7, 2018, Plaintiff's husband, Loren N., completed a witness statement for Plaintiff's December 17, 2018 hearing. He stated that he and Plaintiff "enjoyed a normal life until 2011 when she was diagnosed with hypertension," but after that time "[e]veryone in the family [ ] had to step in to assist on [Plaintiff's] basic duties." He reported that for two years "we battled just keeping her blood pressure steady." He

---

[89] A.R. 993–95.

[90] A.R. 1071–74.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 24 of 42

indicated that Plaintiff had trouble speaking and "just pulling up the words to communicate"; could not remember "family birthdays, passwords, taking medications on time or correctly, paying bills on the correct dates, forgetting to make coffee or set the time, and forgetting what she earlier had planned to make for dinner"; and had balance problems.  Loren N. reported that Plaintiff struggled with basic communications skills and thought processes and that her reasoning skills were "no longer at the forefront."  He noted that Plaintiff would "avoid situations where I am not with her so that she [was] less likely to get embarrassed."  He indicated that Plaintiff "would be confused but not realize she was and fumble to come up with an excuse or reason for her words or actions."  Loren N. reported that Plaintiff had problems with depth perception and eye hand coordination; was fatigued when she attempted to resume her previous kitchen duties.  He noted that her difficulties with "language skills were one of the most noticeable" and that Plaintiff needed help with spelling and pronouncing words.  He noted that Plaintiff "used to fly through the typing tests and now slower pecks at the computer lacking memory of the key placement and hand eye coordination, not to mention intermittent memory of basic computer programs."  Loren N. reported that even after several surgeries and turning their bedroom into a hospital room, Plaintiff "still struggled with and ran into problems doing and completing dialysis on a regular basis."  He also reported that Plaintiff had been put on the kidney replacement list, but "knew that we could not do what was needed at that time to meet the qualifications of Swedish Hospital."  He reported that in December 2017, Plaintiff's new blood pressure medication "lowered her [blood pressure] to the point of not

[being] able to get out of bed." At the time of his statement, Loren N. reported that Plaintiff still struggled with memory, speech, thought processes, balance, and being cold.[91]

*Testimony on December 17, 2018*

On December 17, 2018, Plaintiff appeared and testified with representation before ALJ Cecelia LaCara. ALJ LaCara clarified that the time period at issue was from January 4, 2011 through December 31, 2013 and Plaintiff's attorney agreed. Plaintiff testified that she last worked in military accounting in 2008. Upon later questioning by the ALJ, Plaintiff testified that she worked until 2010 for Worldwide Movers. She testified that in December 2013 she would not have been able to remember how to perform the tasks required by her former job. She testified that during the relevant period, she was not able to speak in a manner that others could understand. She testified that she had a hard time managing her blood pressure; when it was too high she was dizzy and when it was low she could not function. She testified that she felt dizzy nine out of ten times when she stood up and could not stand longer than 2 hours due to dizziness and swelling in her feet. She testified that sitting was painful if she had not "drained." She also testified that she had to elevate her feet and that she was short of breath walking short distances. She testified that she experienced fatigue after hemodialysis; she felt fatigued daily, but that sleep alleviated her fatigue. Plaintiff testified that from 2011 to 2013 she had "people coming in to take care of cleaning the toilets, vacuuming, helping prepare food for my elderly parents." She reported that, starting in 2011, she had had doctor's appointments two to four times per

---

[91] A.R. 375–77.

week. She testified that she had panic attacks six out of seven days a week and got "frustrated, because I know the word I want to say, but I can't say it." She testified that she had problems with her memory and required lists to complete activities of daily living; and had problems with concentration, completing tasks, getting things done quickly, and communicating. She reported that she stopped going to speech therapy because "[t]he deductible was extremely high, and I had no income to pay the deductible." Upon questioning by the ALJ, Plaintiff testified that she did not recall having to hold off on a kidney transplant in 2017 due to a positive cocaine result. She reported that she was still smoking three to four times a day. She testified that she lived with her husband and mother in-law and did not have lakeside property.[92]

Colette Valette, Ph.D., testified as the mental health medical expert. Dr. Valette listed cocaine abuse; cognitive disorder; and anxiety disorder as Plaintiff's medically determinable mental health impairments. Based on her review of the record, Dr. Valette opined that Plaintiff's ability to understand, remember, or apply information was moderately impaired. Dr. Valette noted that Plaintiff's scores in a consultative examination were substantially lower than what Plaintiff had obtained in junior college, but also noted that Plaintiff was able to take care of herself; wash dishes; vacuum; do laundry; make meals; go shopping; and drive. Dr. Valette opined that Plaintiff's ability to interact with others was moderately impaired due to articulation problems and language related diagnoses, including expressive aphasia and dyslexia. She noted that none of Plaintiff's

---

[92] A.R. 54–67.

medical doctors had "notes that they couldn't understand her or that she was having difficulty with speech." Dr. Valette noted that Plaintiff's scores for concentration, persistence, and maintaining pace were "in the borderline range," but also noted that Plaintiff's medical doctors did not describe Plaintiff as distracted or needing directions repeated. She opined that Plaintiff was moderately impaired in this area and "didn't see difficulty" in the area of adapting and managing herself. Dr. Valette opined that Plaintiff could handle simple tasks, but she should avoid tasks involving a lot of speaking. Upon questioning about anxiety by Plaintiff's attorney, Dr. Valette responded that there were no records of emergency room visits for panic attack or heart attack; no psychological treatment records, and that Plaintiff had never been to a psychiatric hospital. She also responded that in this case, Plaintiff's neurocognitive disorder with anxiety attacks and anxiety would not affect her ability to interact with others.[93]

Steven Andersen, M.D., testified as the medical expert. He testified that during the relevant time period, Plaintiff had a kidney injury due to a hypertensive emergency. He then stated, "[b]ut she did not require any ongoing dialysis" and her "kidney function recovered quite nicely." Dr. Andersen also noted that in subsequent follow up appointments with cardiology and nephrology, Plaintiff's doctors did not mention neurologic deficits and that although there are records of speech therapy in December 2011, the speech difficulty resolved. Based on his review of the record, Dr. Andersen opined that Plaintiff would be able lift and carry twenty pounds occasionally and frequently

---

[93] A.R. 39–48.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 28 of 42

lift and carry ten pounds. He opined that Plaintiff could stand, walk, or sit for six hours out of an eight-hour day and would be limited to occasional speaking. Upon questioning by Plaintiff's attorney, Dr. Andersen testified that he would limit Plaintiff to only occasional unprotected heights for dizziness and fatigue and that the lifting and carrying limitation of 20 pounds would be unchanged by significant fatigue.[94]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[95] VE Weiss opined that Plaintiff would not be able to perform past work. VE Weiss opined that there were other jobs that existed in the national and regional economies that Plaintiff could perform, including basic office helper, parking lot attendant, and storage rental clerk. Based on the ALJ's questioning, VE Weiss agreed that exceeding two or more days of unscheduled absences would eliminate any type of work that exists in the national economy. Based on questioning by Plaintiff's attorney, VE Weiss testified that a requirement of elevating feet was not a typical allowance of any job and that breaks one to two times daily for dialysis and needing a sterile environment would "be a special accommodation and not typically allowed."[96]

---

[94] A.R. 48–53.

[95] The ALJ's hypothetical was as follows:

> So, let's assume that we have an individual the same age, education and work experience as that of [Plaintiff] and is limited to light work, with avoiding all unprotected heights and hazardous machinery, and is limited to occupations that only require occasional telephone or verbal communication. Further, this person is limited to simple, routine and repetitive tasks. A.R. 69–70.

[96] A.R. 68–74.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 29 of 42

## IV. DISCUSSION

Plaintiff is represented by counsel.  In her opening brief, Plaintiff alleges that the ALJ's decision was the product of reversible error of law and was not supported by substantial evidence for the following reasons:  1) the ALJ failed to provide germane reasons for rejecting Plaintiff's husband's testimony; 2) the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's testimony; 3) the ALJ failed to discuss Dr. Gitomer's medical source statement; 4) the ALJ should have assigned no weight to the testifying expert opinions of Drs. Andersen and Valette; and 5) the SSA failed to disqualify Dr. Valette due to her professional disciplinary sanctions for misconduct.  Plaintiff seeks remand for a de novo hearing and a new decision.[97]  The Commissioner disputes Plaintiff's assertions.[98]  The Court addresses each of Plaintiff's assertions in turn:

### A. Symptom Testimony

Plaintiff asserts that the ALJ failed to provide germane reasons for rejecting the written testimony of Plaintiff's husband ("Loren N.").  She alleges that the ALJ also failed to provide clear and convincing reasons for discounting Plaintiff's credibility because her allegations were consistent with the medical evidence of treating specialists such as cardiologist Dr. Skolnick, nephrologist Dr. Gitomer, and other treatment records from 2011-2013.[99]  The Commissioner concedes that the ALJ's failure to address Loren N.'s

---

[97] Docket 12 at 1, 14–24.

[98] Docket 13 at 2–16.

[99] Docket 12 at 14–18.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 30 of 42

written testimony was error. However, the Commissioner contends that this error was harmless. Specifically, because Loren N "did not describe any limitations beyond those alleged by Plaintiff, the ALJ's reasons for discounting Plaintiff's testimony apply with equal force to the lay witness statements."[100]

1. *Plaintiff's Symptom Testimony*

Credibility determinations are the province of the ALJ.[101] An ALJ engages in a two-step analysis to determine the credibility of a claimant's testimony regarding subjective pain or symptoms.[102] In the first step, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."[103] On this point, the ALJ determined that Plaintiff's embolic disease; history of cerebrovascular accident; renal disease; speech dysphasia secondary to hypertension; cognitive disorder; and anxiety disorder were severe impairments.[104]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's symptoms by considering "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how

---

[100] Docket 13 at 11–12.

[101] *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989).

[102] *Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014); *Treichler v. Comm'r of Soc. Sec. Admin.,* 775 F.3d 1090, 1102 (9th Cir. 2014).

[103] *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996) (*superseded by statute,* 20 C.F.R. §§ 404.1529 (c)(3), 416.929 (c)(3), *effective for claims before March 27, 2017*).

[104] A.R. 17.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 31 of 42

[the claimant's] symptoms affect [her]."[105]   If a claimant meets the first test and there is no evidence of malingering, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and convincing reasons for doing so."[106]   The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[107]   An ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.[108]   If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.[109]

Here, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence.   The ALJ provided the following reasons: 1) Plaintiff's activities of daily living were "inconsistent with an individual whose symptoms

---

[105] 20 C.F.R. §§ 404.1529(a), 416.929(a) (text of subsection for claims before March 27, 2017).

[106] *Smolen,* 80 F.3d at 1281; *Ghanim v. Colvin,* 763 F.3d 1154, 1163 (9th Cir. 2014).

[107] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)).

[108] *Thomas v. Barnhart,* 278 F.3d 947, 958–59 (9th Cir. 2002) (internal quotations and citations omitted).

[109] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 32 of 42

are unremitting and wholly unresponsive to treatment" and 2) Plaintiff stopped working for reasons unrelated to her impairments.[110]

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."[111]  In this case, Plaintiff testified that during the relevant time period, she had others either do her household chores for her or received help with the chores.[112]  Plaintiff's husband also reported that Plaintiff required assistance to complete household chores and needed "sticky notes all over the house" to help her remember to complete daily activities.[113]  Dr. Rose's September 2012 report indicated that Plaintiff had the ability to perform basic household chores, prepare and cook meals, go shopping, drive, and spend time with her grandchildren.[114]  However, with or without help, these household activities were not inconsistent with Plaintiff's statements regarding her symptoms, including difficulties with speech, memory problems, dizziness and panic attacks with high blood pressure, fatigue with low blood pressure, pain with sitting for a long period of time, and swelling from standing.  The household activities, coupled with Plaintiff's symptoms, did not easily transfer to a work situation.[115]

---

[110] A.R. 25.

[111] *Ghanim v. Colvin,* 763 F.3d 1154, 1165 (9th Cir. 2014) (internal citations omitted).

[112] A.R. 61.

[113] A.R. 375.

[114] A.R. 850.

[115] A.R. 55–64.  *See Smolen,* 80 F.3d at 1287 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not

Further, Plaintiff's treating provider, Dr. Gitomer noted that Plaintiff's symptoms included a rapid rise in blood pressure, fatigue, and weakness. He opined that Plaintiff's prognosis was "poor."[116] ANP Honas, under the supervision of Dr. Skolnick, concluded that Plaintiff was unable to work due to complications associated with high blood pressure.[117]

Stopping work for reasons unrelated to an alleged impairment can support an adverse credibility determination.[118] Here, Plaintiff testified that she last worked in 2010 and reported to Dr. Rose in 2012 that she "turned [her] boss in for embezzling, and [she] got fired."[119] However, Plaintiff's testimony regarding her impairments covered only the time period from January 2011 to December 2013.[120] Additionally, the ALJ never actually clarified Plaintiff's reason(s) for stopping work at the hearing.[121] Taken together, Plaintiff's testimony regarding her physical and mental limitations during the relevant time period is not weakened by potentially stopping work for reasons unrelated to her alleged

---

easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."); *Garrison v. Colvin,* 759 F.3d 995, 1016 (9th Cir. 2014) ("Recognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations', we have held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility.") (quoting *Reddick v. Chater,* 157 F.3d at 722).

[116] A.R. 1071.

[117] A.R. 930.

[118] *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (ALJ did not err in considering the claimant's work history and his admission that he left his job for reasons other than his alleged impairment).

[119] A.R. 54, 852.

[120] A.R. 37, 54–67.

[121] A.R. 64–66.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 34 of 42

impairments in 2010.

In sum, the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony regarding her impairments.

2. *Loren N.'s Written Testimony*

The parties have agreed that the ALJ erred by failing to consider Loren N's written testimony.[122]  The Ninth Circuit has held "that competent lay witness testimony cannot be disregarded without comment," and "in order to discount competent lay witness testimony, the ALJ must give reasons that are germane to each witness."[123]  However, the Ninth Circuit has also held that "because the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness] testimony."[124]

In this case, the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's symptom testimony.  Loren N.'s statement supports Plaintiff's subjective complaints and provides added detail to Plaintiff's testimony regarding her symptoms.[125] Therefore, it follows that the ALJ failed to give germane reasons rejecting Loren N.'s statement by ignoring it.

---

[122] Docket 12 at 14–18; Docket 13 at 11–12.

[123] *Molina v. Astrue,* 674 F.3d 1104, 1114–15 (9th Cir. 2012) (internal quotations and citations omitted) (superseded by regulation on other grounds).

[124] *Id. (citing Valentine v. Comm'r Social Sec. Admin.,* 574 F.3d 685, 694 (9th Cir. 2009)).

[125] A.R. 375–77.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 35 of 42

B.  <u>Medical Opinions</u>

Plaintiff asserts that the ALJ erred by failing to include an analysis of Dr. Gitomer's medical opinion.  "Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[126]  And, in the Ninth Circuit, "reports containing observations made after the period for disability are relevant to assess the claimant's disability."[127]  Further, an "ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."[128]

In this case, it is unclear whether the ALJ gave Dr. Gitomer's opinions "no weight" or "little weight" as the ALJ failed to the discuss the medical source statement at all.  Dr. Gitomer opined that Plaintiff would require 1-2 unscheduled breaks for dialysis in an eight-hour workday.  He opined that Plaintiff would need to keep her legs elevated for 20% of an eight-hour workday and would miss up to four days of work each month due to her impairments.[129]  Based on the vocational expert's testimony at the December 2018 hearing, these accommodations would eliminate normal, competitive work.  Specifically, the vocational expert opined that taking one to two breaks a day for dialysis in a sterile

_____

[126] 20 C.F.R. § 404.1527(c).  This section applies to claims filed before March 27, 2017.

[127] *Smith v. Bowen,* 849 F.2d 1222, 1225 (9th Cir. 1988).

[128] *Garrison v. Colvin,* 759 F.3d 995, 1012–13 (9th Cir. 2014).

[129] A.R. 1073.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 36 of 42

environment would be "a special accommodation and not typically allowed."[130]  VE Weiss

also testified that "[e]levating the feet is not a typical allowance of any job" and that four

unexcused absences from work would eliminate work that exists in the national

economy.[131]  Although the Commissioner argues that Dr. Gitomer's opinion did not

"establish any limitations during the relevant period and thereby does not negate the

validity of the ALJ's ultimate non-disability determination,"[132] the ALJ did not provide this

reason and the Court is "constrained to review the reasons the ALJ asserts."[133]

   Although Dr. Gitomer provided his medical opinion in 2018, he did not specify the

time period that his opinion covered.[134]  The medical records and Plaintiff's testimony

---

[130] It is not entirely clear from the transcript of the December 2018 hearing if VE Weiss opined that the one to two breaks for dialysis were themselves a special accommodation or if one to two breaks of one to two hours were a special accommodation.  The exchange between Plaintiff's attorney and VE Weiss was as follows:

   Q     What if they needed to take breaks one to two times a day for dialysis, needing a sterile environment?

   A     That would be a special accommodation and not typically allowed.  One to two hours a day, you're saying?

   Q     Um-hum.

   A     That would not typically be an accommodation that would be applicable with normal competitive work.  A.R. 73.

[131] A.R. 70–73.

[132] Docket 13 at 12–13.

[133] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ — not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.").

[134] A.R. 1071–74.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 37 of 42

support his opinions. For example, during the time period from January 2011 through December 2013, the record demonstrates that Plaintiff had difficulties controlling her blood pressure, causing a range of symptoms including expressive aphasia, fatigue, and chronic hypertensive nephropathy.[135] After 2013, Plaintiff's chronic kidney disease progressed, leading to multiple surgeries and dialysis.[136] Plaintiff testified that she had swelling and dizziness standing for a long period of time and that sitting for a long period of time was painful "if I have not drained." She testified that she was on dialysis, had to elevate her feet, and wore compression socks.[137]

The ALJ's rejection of the opinion of a treating or examining physician may be based in part on the testimony of non-examining medical expert.[138] Therefore, the Court declines to accept Plaintiff's conclusion that a non-examining medical expert's testimony, "by force of logic," deserves little to no weight.[139] At the same time, a non-examining physician's opinion with nothing more is not substantial evidence.[140] Here, the ALJ

---

[135] A.R. 411–20, 424–30, 492–95, 516–19, 532–33.

[136] A.R. 545–620, 667–68, 686–90, 710–12, 738, 806–09.

[137] A.R. 58–64.

[138] *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record.")

[139] Docket 12 at 19.

[140] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 602 (9th Cir. 1999).

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 38 of 42

assigned great weight to testifying medical experts, Drs. Andersen and Valette.[141]  Dr. Andersen's opinions were not consistent with Dr. Gitomer's medical opinion or ANP Honas's work opinion.[142]  Relying on Dr. Andersen's opinion while ignoring the medical opinions of Plaintiff's treatment providers does not amount to substantial evidence. Additionally, Dr. Andersen's expertise is in emergency medicine, while Dr. Gitomer is a nephrologist.[143]  It was reversible error for the ALJ to ignore Dr. Gitomer's medical opinions.

For the foregoing reasons, the ALJ failed to meet her burden of providing specific, legitimate reasons based on substantial evidence for rejecting Dr. Gitomer's medical opinions.

C.  Dr. Valette's Testimony

Plaintiff asserts that the ALJ's decision was not supported by substantial evidence because "the agency failed to disqualify Colette Valette, Ph.D., due to her professional disciplinary sanctions for misconduct in connection with a Social Security disability claim, or to disclose it honestly to [Plaintiff]."[144]  In response, the Commissioner argues that

---

[141] A.R. 23, 25.

[142] A.R. 50–53, 1071–74, 930.

[143] A.R. 49; see 20 C.F.R. § 404.1527(c)(5), Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) (the opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist).

[144] Docket 12 at 1, 22–24.

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 39 of 42

Plaintiff did not provide evidence to support her contentions that Dr. Valette was disqualified from testifying.[145]

Because this matter is remanded on other grounds, this Court will not address Plaintiff's argument that Dr. Valette should have been disqualified as an expert witness in this case. However, this Court notes that it has previously cited to another case in the 9th Circuit in which the ALJ gave no weight to Dr. Valette's opinion because she was "no longer an eligible impartial examiner for the Social Security Administration."[146]

D. Scope of Remand

Plaintiff asks the Court to vacate the final agency decision and remand to the Commissioner for a de novo hearing and a new decision.[147] The Commissioner asks the Court to affirm the ALJ's decision.[148]

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[149] The court follows a three-step

---

[145] Docket 13 at 15–16.

[146] *Smith v. Saul,* No. 3:19-cv-00123-RRB, at 6 (D. Alaska, Jan. 27, 2020) (order remanding for further proceedings) (citing *Quinones v. Comm'r of Soc. Sec.,* No. 19CV274-W (BLM), 2019 WL 3817997, at *7 (S.D. Cal. Aug. 14, 2019), *report and recommendation adopted,* No. 19-CV-0274 W (BLM), 2019 WL 4193391 (S.D. Cal. Sept. 4, 2019)).

[147] Docket 12 at 24.

[148] Docket 13 at 16.

[149] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 40 of 42

analysis to determine whether the case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[150] "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[151] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[152] "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[153] But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[154]

In this case, the Court has found that the ALJ did not provide legally sufficient reasons for rejecting Plaintiff's testimony, the written testimony of her husband, or the opinion of her treating physician. Second, although the record has been extensively developed with treatment notes from medical visits spanning January 2011 through 2018,

---

[150] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison,* 759 F.3d at 1020).

[151] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[152] *Treichler*, 775 F.3d at 1101.

[153] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[154] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

Case No. 3:20-cv-00037-TMB
Decision and Order
Page 41 of 42

the ALJ's RFC determination does not include the limitations set forth in Dr. Gitomer's medical opinion. As detailed above, the improperly rejected medical opinion evidence and lay witness written testimony still raise questions about how Plaintiff's symptoms impacted her functional limitations during the relevant time period. Therefore, the Court is not satisfied that further administrative proceedings would serve no useful purpose. Further, Plaintiff's request is for a de novo hearing and new decision. Having carefully reviewed the administrative record, including the extensive medical records, the Court concludes that remand for further proceedings is appropriate in this case.[155]

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were not free from legal error and were not supported by substantial evidence in the record. Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 12 GRANTED, the Commissioner's motion at Docket 13 is DENIED, and this matter is REMANDED for further proceedings consistent with this Order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 19th day of October, 2020 at Anchorage, Alaska.

*/s/ Timothy M. Burgess*
UNITED STATES DISTRICT JUDGE

---

[155] The Ninth Circuit has clarified that courts will "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison v. Colvin,* 759 F.3d 995, 1021 (9th Cir. 2014); *Burrell v. Colvin,* 775 F.3d 1133, 1141 (9th Cir. 2014).